**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHELE CZERWINSKI,**

                                        **Plaintiff,**

        **-against-**                                        **6:18-CV-0635**

**NEW YORK STATE DEPARTMENT OF  CORRECTIONS**
**AND COMMUNITY SUPERVISION,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

## I.    INTRODUCTION

Plaintiff Michele Czerwinski ("Plaintiff") commenced this action against her employer, the New York State Department of  Corrections and Community Supervision ("DOCCS" or "Defendant"), asserting employment discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. *See* Compl. Dkt. No. 1.  Defendant moves to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 8.  Plaintiff opposes the motion.  *See* Dkt. No. 13.  The Court has elected to decide the motion without oral argument.  For the reasons that follow, Defendant's motion is granted in part and denied in part.

1

## II.    BACKGROUND

Plaintiff, who has been employed by Defendant since 2002 as a Nurse I, Nurse II, and now a Nurse Administrator I, Compl. ¶ 4, brings claims of Title VII gender, race, and national origin discrimination based on a hostile work environment and disparate treatment, and Title VII retaliation.  *See generally,* Compl.  Plaintiff also brings constitutional equal protection claims "based on her gender, race and ethnic and national origin."  *Id.*, ¶70.  Plaintiff's claims arise from conduct primarily taken by her former supervisor at the Mid-State Correctional Facility in Marcy, New York, Deputy Superintendent for Administration Terry Whitaker ("DSA Whitaker").  *See generally id.*   The Complaint asserts that "Plaintiff has been the subject of incessant discriminatory treatment and retaliatory action by DSA Whitaker and the rest of her superiors at DOCCS, in the form of interference with her job duties, the undermining of her authority amongst the staff she supervises, and the unfounded, overstated, notices of discipline that have been brought against her as attempts to fire her." *Id.,* ¶36.  Although Plaintiff omits certain dates and time frames for some of the claimed wrongdoing, the following relevant factual allegations in the Complaint are assumed to be true for purposes of this motion.

Plaintiff became employed by DOCCS in 2002, and received satisfactory employment evaluations until 2016.  *Id.,* ¶8.  In March 2013, Plaintiff received a formal counseling related to cleanliness of the nursing unit from her direct supervisor, DSA Whitaker, followed by repeated actions that she contends undermined her authority.  *Id.*, ¶9. In this regard, Plaintiff alleges that "DSA Whitaker ... has repeatedly taken every minor infraction committed by Plaintiff or those in the unit she supervises and thrown it in Plaintiff's

face and blown it out of proportion." *Id.*  In the fall and winter of 2015, DSA Whitaker's actions and comments "escalated," further undermining Plaintiff's authority and her ability to do her job.  *Id.*, ¶10.  This included DSA Whitaker saying to Plaintiff in front of doctors she worked with and staff she supervised "that respect was earned," implying that Plaintiff did not have his respect. *Id*.  DSA Whitaker told Plaintiff repeatedly that she was the reason nurses were leaving her unit. *Id.*  Also during the fall and winter of 2015, DSA Whitaker put Plaintiff in positions that made completing her duties more difficult, such as pulling Plaintiff out of a job interview for a new hire to assist with an inventory count. *Id.,* ¶11.  DSA Whitaker also forbade Plaintiff from contacting the facility superintendent, and reversed Plaintiff's decisions regarding employees working under her supervision. *Id.,* ¶12.  In one incident, DSA Whitaker backed Plaintiff into the corner of a triage room and mirrored her movements to prevent her from leaving, and then berated her in front of other staff while pointing and shaking his umbrella at her.  *Id.,* ¶13.  In December 2015, DSA Whitaker tasked Plaintiff to complete the "ACA Standards folder" for her department prior to an audit. *Id.,* ¶14.  Plaintiff completed this task but asked the auditor to aide her "in fixing her department's folders," which the auditor agreed to do. *Id.*  However, DSA Whitaker ordered Plaintiff to fix the folders before the auditor arrived, which, Plaintiff claims, undermined her authority. *Id.*

On December 28, 2015, Plaintiff filed a complaint with the Office of Diversity Management (ODM).  *Id.,* ¶15, and Compl. Ex. "B."  The copy of the ODM complaint attached to the Complaint does not include any attachment detailing the alleged acts of discrimination.  Where asked on the ODM complaint form what the "[c]laim of

3

discrimination, harassment, or retaliation [was] based on," Plaintiff checked the boxes for "Age", "Gender", "Arrest Record", "Domestic Violence", "Criminal Record", and "Retaliation," but did not check "Race", "Color", or "National Origin." Compl. Ex. B. Defendant provided a complete copy of this ODM complaint. *See* Moore Decl., Ex. "1". The factual statement therein concerns numerous disagreements Plaintiff had with DSA Whitaker's supervision of her, how Plaintiff felt humiliated by his conduct, and details conduct by DSA Whitaker that Plaintiff believed was not "conducive [to the] work environment" and that "caused harm to the medical unit." *Id.*, at p. 11. The factual statement is devoid of any mention of specific sex, national origin, or race-based language or conduct associated with any of the allegations therein. *Id.* However, in opposition to the instant motion Plaintiff points to her allegation in this document that TSA Whitaker "has made statements about my weight and referenced me working out" as an indication of a gender-based motivation for TSA Whitaker's conduct. *See* Pl. Mem. L. at 15. The factual statement of the ODM complaint also does not contain any reference to DSA Whitaker's conduct having been taken as retaliation for Title VII protected conduct. *See* Moore Decl., Ex. "1". ODM received this complaint on December 30, 2015 and began investigating it. Compl. ¶16.

On January 27, 2016, DOCCS sent Plaintiff a Notice of Discipline (NOD) with 6 separate charges, indicating that DOCCS sought the penalty of dismissal from state service and loss of all accrued annual leave. Comp., ¶17; Compl. Ex. "C".[1] Plaintiff filled a

---

[1]These charges were:

1. On or about November 13, 2015, while on duty, you failed to properly perform your duties as Nurse Administrator at the Mid-State Correctional Facility, in violation of the DOCCS Employees Manual, Sections 2.2, 2.5, 2.23, 3.1, and 13.3 as well as DOCCS Directive #4929 - "Control of Drugs, Needles, Syringes and Sharps". Specifically, despite prior instruction,

(continued...)

disciplinary grievance disputing the sought-after penalty.  Compl., ¶17.  On August 19,

2016, after a three-day hearing, Arbitrator Ivor R.  Moskowitz issued a  decision in which he

found Plaintiff guilty of Charges 1 and 3, not guilty of Charges  2 and 6, dismissed Charge 4

"on procedural grounds without prejudice because it may still be reinstated," and noted that

Charge 5 had been withdrawn.  Compl. Ex. "D".   Arbitrator Moskowitz found that the

---

[1](...continued)
you failed to properly conduct an accurate inventory review and correct deficiencies in that you failed to remove expired syringes from inventory until you were directed to do so by Deputy Superintendent for Administration Whitaker.

2.  On January 11, 2016, at approximately 2:50 p.m. while on duty at the Mid-State Correctional Facility, you were insubordinate to a supervisor in violation of the DOCCS Employees Manual, Section 2.5.  Specifically, after being directed by Deputy Superintendent for Administration Whitaker to immediately ·report to his office to review accreditation documentation, you failed to report to his office until he contacted you a second time and directed you again to report to his office immediately.

3. During the period of November 16, 2015, through January 12, 2016, you failed to properly perform your duties as Nurse Administrator in violation of the DOCCS Employees' Manual, Sections 2.5, 2.23, 3.1. and 7.9.  Specifically, you failed to properly complete the mandates required in updating accreditation folders required for the Health Services audit scheduled for January 12, 2016, despite being directed to do so by DSA Whitaker and DSP Joslyn.

4. On January 12, 2016, while on duty at the Mid-State Correctional Facility, you communicated in an unprofessional and disrespectful manner to a superior in violation of the DOCCS Employees Manual, Section 2.7.  Specifically, during a Health Services audit with Central Office staff and Superintendent Ward, when questioned about medical documentation by Superintendent Ward and Assistant Director Collett, you refused to properly respond and instead repeatedly replied [with] words to the effect of  "let's just move on" and "I'd like to just move on".

5. On or about January 14, 2016, while on duty at the Mid-State Correctional Facility, you failed to properly perform your duties as Nurse Administrator in violation of the DOCCS Employees' Manual, Section 2.23, 3.1, 7.9 and Health Services Policy #3.08 - "Stock Drugs Storage and Accountability".   Specifically, you instructed Cindy Kotary, Registered Nurse, that nurses are to write prescriptions for every diabetic for their lantus versus using available stock lantus.

6. On January 25, 2016, while on duty at the Mid-State Correctional Facility, you were insubordinate to a superior in violation of the DOCCS Employees' Manual, Section 2.5.  Specifically, you were directed by Deputy Superintendent for Administration Whitaker to supply a memorandum explaining why you gave the direction described in Charge #5 above.  You refused to provide such.

Compl. Ex. "C".

appropriate penalty for the upheld charges was a one-month suspension without pay. *Id.* Plaintiff claims she has not been paid for the additional time that she was suspended without pay, and "had to institute an Article 75 petition through her Union because DOCCS has not complied with the Arbitrator's order." Compl. ¶20. On January 23, 2018, Plaintiff received a judgment from the New York State Supreme Court, County of Albany, "confirming the arbitrator's award and ordering DOCCS to pay Plaintiff what she is owed from the award with interest. *Id.*, ¶21. However, Plaintiff still has not been paid despite the Decision only giving DOCCS sixty (60) days to comply with the order as DOCCS is appealing the decision." *Id.*

Plaintiff returned to work on August 25, 2016 "and has since continued to receive discriminatory and retaliatory treatment from DSA Whitaker, who at the time was still Plaintiff's direct supervisor." *Id.*, ¶22. Plaintiff alleges that upon her return to work, she "was welcomed back with open hostility and further retaliation by her superiors and faced further obstacles to performing her job. Some of these obstacles included: having to fight to have her health insurance reactivated, being hassled when getting her non-back pay checks, and having to fight to have her accruals properly calculated." *Id.* ¶23. Plaintiff attaches to the Complaint a list of events that she contends happened to her since her return to work. Compl. Ex. "F". This list includes allegations of problems Plaintiff was having getting her health insurance reactivated, "being hassled" while trying to get non-back pay checks, having to fight to have her accruals properly calculated, and a doctor, Dr. Smith, saying to her: "Do not take this as a racial slur," but "the guy is naked in the window and looks like an ape." *Id.*

On October 12, 2016, Plaintiff met with DSA Whitaker for a formal counseling session which was supposed to be "non-punitive" and "positive and constructive." Compl. ¶24. However, "[d]espite the intention, the memo reflecting the counseling session . . . reads as a laundry list of the shortcomings of Plaintiff and the unit she supervises, which she had only been returned to for less than two months." *Id.* The day after the formal counseling session, Plaintiff went to speak to Captain Goppert and Captain Adamik and expressed her feelings that she "was unsafe around DSA Whitaker." *Id.* ¶25. Captain Goppert and Captain Adamik asked Plaintiff to write a memorandum about why she felt this way. *Id.* The memorandum "discussed the consistent verbal abuse from DSA Whitaker and the level of micromanagement, which went as far as asking Plaintiff to call him every time she leaves her office." *Id.* This one-page memorandum, addressed to DSP Joslyn, alleges unspecified "constant verbal abuse" and an "almost" physical assault by DSA Whitaker in front of Plaintiff's staff, that Plaintiff fears that DSA Whitaker's conduct will "escalate and cause [Plaintiff] bodily harm," that DSA Whitaker micro-manages Plaintiff's conduct, and that Plaintiff's office has been unlocked after she left the facility. Compl. Ex. "G". The memorandum contains no allegations of specific sex, race, or national origin-based language or comments by DSA Whitaker, nor any reference to retaliation for protected conduct. *See id.*

Also on October 12, 2016, an attorney from Plaintiff's union, Michael F. Geraghty, Jr., Esq., sent a letter on Plaintiff's behalf to DOCCS Deputy Commissioner Michael Martuscello complaining that Plaintiff was subjected to a "hostile work environment" upon her return to work where she was allegedly "bullied" daily. Compl. Ex. "H". The Complaint describes the

"primary concerns in the letter" as "DSA Whitaker gives Plaintiff non-nursing related directives which take away time from her nursing department duties, DSA Whitaker has circumnavigated Plaintiff's requests involving nursing department staffing issues, and DSA Walker routinely berates Plaintiff during personal supervisory sessions and often leaves the door open so that others can hear the berating." Compl. ¶26. The letter makes no mention of specific sex, race, or national origin-based conduct, nor any reference to retaliation for Title VII protected conduct. *See* Compl. Ex. "H".

On October 24, 2016, Plaintiff's attorney in this action, Stephen Ciotoli, Esq., sent a letter to Deputy Commissioner Martuscello which purportedly "detailed the discrimination and retaliation-based issues Plaintiff was facing and informed DOCCS that Plaintiff would proceed with EEOC claims if the situation was not rectified." *Id.*, ¶28. This letter concerns actions by DSA Whitaker that Plaintiff considered abusive, malicious and retaliatory, but makes no mention of specific sex, race, or national origin-based conduct or statements by DSA Whitaker, nor any reference to the alleged retaliation being for Title VII protected conduct. Compl., Ex. "J". The letter closes by indicating that if DSA Whitaker's conduct is not curtailed, the attorney will institute a suit "with the New York State Division of Human Rights and the Equal Employment Opportunity Commission (EEOC), under Title VII, and other appropriate statutes." *Id.*

On December 1, 2016, Attorney Geraghty sent a letter to Acting Superintendent of Mid-State Correctional Facility, Matthew Thoms, "requesting help with the hostile work environment created for Plaintiff by DSA Whitaker." *Id.*, ¶26. This letter addresses a concern about DSA Whitaker's "deliberate and calculated campaign of Harassment,

8

Bullying and Intimidation of Ms. Czerwinski," but makes no mention of specific sex, race, or national origin-based conduct or statements by DSA Whitaker, nor any reference to retaliation for Title VII protected conduct.  Compl., Ex. "I".

On December 16, 2016, Plaintiff received a memorandum asking for her response to a workplace violence complaint that occurred on December 1, 2016.  Compl. ¶30.  Plaintiff contends that "[t]his complaint amounted to, at most, an unpleasant interaction between Plaintiff and one of the staff she supervises and misstated some of the facts to make out Plaintiff to be worse than she was. The complaint also unnecessarily went out of its way in multiple paragraphs to attack Plaintiff's character." *Id.*

On December 22, 2016, Attorney Ciotoli sent another letter to Deputy Commissioner Martuscello. *Id.* ¶28. In this letter, Attorney Ciotoli indicates that he had been retained "to represent Ms. Czerwinski regarding the workplace bullying and a hostile working environment she is experiencing at Mid-State Correctional Facility by Deputy Superintendent of Administration Terry Whitaker."  Compl. Ex. "J", p.  2.  Attorney Ciotoli also indicates that he had previously provided "this notice to give the Department an opportunity to rectify this situation before the matter escalated further, but you have not responded, and since then the harassment and bullying have only intensified for Ms. Czerwinski.  We would like to avoid bringing a legal action against Mr. Whitaker and the Department, so please respond to our request for appropriate corrective action and please let us know what the Department plans to do about this very serious situation." *Id.*  This letter makes no mention of specific sex, race, or national origin-based conduct or statements by DSA Whitaker or anyone else, nor any reference to retaliation for Title VII

protected conduct. *See id.* The Complaint asserts that "Defendants [*sic*] have never responded to any of these letters from Plaintiff's counsel and have completely ignored her concerns and issues at DOCCS." Compl. ¶29.

On January 6, 2017, Plaintiff was placed on administrative leave by Superintendent Matthew Thoms "because of things that were said during an interview with Magdalah Plaisime, a candidate Plaintiff was interviewing for a nursing position in her unit." *Id.* ¶31. On February 2, 2017, DOCCS sent Plaintiff a NOD/Charges "completely unrelated to the things allegedly said during the interview with Ms. Plaisime. This NOD called for the penalty of dismissal from service and loss of any accrued annual leave based on three charges that were largely similar to the first set of charges which Plaintiff defeated, including failure to complete a large number of ACA standards folders by an unrealistic date, and not getting permission from DSA Whitaker to move her own department's inventory from one stock room to another." *Id.* ¶32. On February 17, 2017, DOCCS sent Plaintiff another NOD with two charges relating to the comments that Plaintiff allegedly said during her interview with Ms. Plaisime on December 30, 2016. *Id.,* ¶33. "The comments allegedly said by Plaintiff, who is of mixed race, were: 'They don't like blacks around here,' and 'Do you like gay people? I am only asking because if you don't like gay people, you cannot work around here.'" *Id.* Plaintiff disputed this penalty and denied making these statements. *Id.*

Plaintiff requested an interim opinion on whether there was probable cause for the January 6, 2017 suspension. *Id.,* ¶34. On June 6, 2017, Arbitrator E. Davis Hyland issued a decision in which he found that DOCCS did not have probable cause to suspend Plaintiff on January 6, 2017, and ruled that she should be placed back on payroll and refunded the

accruals she used. *Id.*; *see* Compl. Ex. "L". A final opinion was issued by Arbitrator Hyland on October 19, 2017, who found that DOCCS did not have probable cause to suspend Plaintiff on February 17, 2017, that no disciplinary penalty was appropriate, that Plaintiff was not guilty of the charges, that Plaintiff was entitled to reinstatement and should be placed back on the payroll and refunded the accruals she used. Compl. ¶35; *see* Compl. Ex. "M". The Complaint asserts that "Plaintiff has been the subject of incessant discriminatory treatment and retaliatory action by DSA Whitaker and the rest of her superiors at DOCCS, in the form of interference with her job duties, the undermining of her authority amongst the staff she supervises, and the unfounded, overstated, notices of discipline that have been brought against her as attempts to fire her." Compl. ¶36. Plaintiff claims that she has not been paid for any of the time she was suspended, and that "DOCCS has fought the Article 75 proceeding to enforce the arbitration award tooth and nail including appealing the decision of the Supreme Court, County of Albany affirming the award." *Id.*, ¶37.

Plaintiff claims that "since her return to work after the second set of charges," she has "continued to be subject to harassment by DOCCS employees including being elbowed in the right arm by Debbie Jadhon, Ms. Plaisime inappropriately touching Plaintiff's left arm, and Lyubov Savitskiy shoving her injured left shoulder and threatening to punch her twice when Plaintiff was making rounds in the infirmary." *Id.*, ¶38. Plaintiff also alleges unspecified verbal abuse and phone calls "from the facility at 10:30 p.m. and on weekends when she is off duty that feel like they are intended to harass Plaintiff." *Id.* ¶39. She also alleges that "Ms. Plaisime has accused Plaintiff of 'retaliating' against her and complained to Plaintiff's new supervisor about the way Plaintiff spoke to her for which Plaintiff received a

counseling memorandum." *Id.* Plaintiff makes no specific claim of sex, national origin, or race-related language or conduct accompanying these events.

On December 4, 2017, Plaintiff filed a complaint with the Equal Employment Opportunity Commission "alleging discrimination by the Defendants[2] based on her gender and race and/or national origin, and retaliation for filing an internal complaint alleging harassment." *Id.*, ¶6. A complete copy is not annexed to the Complaint but Defendant provided a copy. *See* Moore, Decl., Ex. 2. The allegations and causes of action therein largely mimic those contained in the Complaint, with the exception that there is no constitutional equal protection claim. *See id.*

On January 12, 2018, Plaintiff was given a "Formal Counseling" memo by DSA S. O'Connor because she and RN Plaisime were heard by other staff arguing loudly in the hallway on January 10, 2018 regarding an instance where RN Plaisime had apparently called in for an unscheduled absence. *See* Compl., Ex. "N". Plaintiff responded in writing to the Formal Counseling memo by stating, *inter alia*, that she asked RN Plaisime "a question regarding if she spoke with time and attendanc The "Verified EEOC Complaint" is brought against DOCCS and DSA Whitaker. e to resolve the situation," that RN Plaisime "became agitated," that "this is not the first incident reported by medical staff that this employee has been disruptive," that Plaintiff disagreed "with the formal counseling based that I was not inappropriate I was a concerned Supervisor," and that in the hallways "all sounds are amplified." *Id.* Plaintiff also asserts in this document: "I have been verbally and physically assaulted and have been the one reprimanded for the behavior with this section 2.7 why

---

[2]The "Verified EEOC Complaint" is brought against DOCCS and DSA Whitaker. *See* Moore, Decl., Ex. 2.

[*sic*] ?  I am not chasing employees down the hallway, calling them off hours disturbing them or pushing or shoving them or creating such a toxic environment." *Id.*  There are no allegations of specific sex-based, national origin-based, or race-based language or conduct in Plaintiff's response.  *See id.*

The five causes of action alleged in the Complaint are: (1) gender-based hostile work environment and discrimination under Title VII, *id.*, ¶¶40 – 46 ("First Cause of Action");  (2) retaliation under Title VII, *id.*, ¶¶47 – 53  ("Second Cause of Action"); (3) gender-based disparate treatment under Title VII, *id.*, ¶¶54 – 58  ("Third Cause of Action"); (4) retaliation and discrimination under Title VII based on race and national origin, *id.*, ¶¶59 – 66  ("Fourth Cause of Action"); and (5) equal protection violations based on gender, race, and national origin, *id.*, ¶¶67 – 75  ("Fifth Cause of Action").  The Complaint seeks money damages, plus attorneys' fees, costs and disbursements incurred in prosecuting this action.  *Id.*, p. 15.

## III.    STANDARDS OF REVIEW

### a.  12(b)(1)

A motion brought pursuant to Fed. R. Civ. P. 12(b)(1) challenges the subject matter of the Court to address a case or certain claims in the case.  A case is to be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *Makarova v. United States*, 201 F. 3d 110, 113 (2d Cir. 2000).

### b.  12(b)(6)

A motion brought pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of the claims alleged in the matter.  On such a motion, the Court must accept "all factual

allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted). This tenet does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements ... are not entitled to the assumption of truth." *Id.; see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## IV.   DISCUSSION

Defendant moves to dismiss each of the causes of action in this matter.

### a.  First and Third Causes of Action - Gender-Based Discrimination

Plaintiff alleges in the First Cause of Action that she was subjected to "hostile and

discriminatory work environment . . . based on her gender," Compl. ¶ 42, and in the Third

Cause of Action that she was subjected to disparate treatment based on her gender

inasmuch as she was treated "less favorably than [Defendant] treated similarly situated

male employees in violation of Title VII." *Id.* ¶ 55. Beyond these conclusory allegations, the

Complaint is bereft of allegations tying the alleged hostile work environment or any discrete

employment action to Plaintiff's gender.

"It is axiomatic that mistreatment at work, whether through subjection to a hostile

work environment or through such concrete deprivations as being fired or being denied a

promotion, is actionable under Title VII only when it occurs because of an employee's sex,

or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

In other words, the incidents comprising a discrete act or hostile work environment claim

must occur under circumstances in which they can "reasonably be interpreted as having

been taken" because of the Title VII classification alleged. *Gregory v. Daly*, 243 F.3d 687,

695 (2d Cir. 2001).

Regarding the hostile work environment claim, Plaintiff recounts a litany of situations

involving DSA Whitaker which Plaintiff found to be unjustified, harassing, and bullying, but

she provides no allegations raising a reasonable inference that the conduct was taken on

account of Plaintiff's gender. The lone statement attributed to DSA Whitaker that Plaintiff

contends evinces a gender-based animus underlying the hostile work environment is

contained in Plaintiff's December 28, 2015 ODM complaint where Plaintiff asserts that DSA

Whitaker "has made statements about [Plaintiff's] weight and referenced [her] working out."

Plaintiff did not make this allegation in the Complaint, but even if she had, it would be

insufficient by itself to raise a plausible inference that DSA Whitaker was motivated by

gender animus. *See King v. Aramark Servs., Inc.*, No. 1:19-CV-77, 2019 WL 3428833, at *18–19 (W.D.N.Y. July 30, 2019)(finding that disparaging comments about the plaintiff's weight, by themselves, are insufficient to give rise to a plausible inference of gender discrimination)(citing *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234, 2010 WL 3932354, at *14 (S.D.N.Y. Sept. 29, 2010) (ruling on summary judgment that comments directed at the plaintiff describing her as a "fat ass" were "certainly rude" but were "gender neutral statements that do not indicate gender animus"); *Ortega v. N.Y.C. Off-Track Betting Corp.*, No. 97 Civ. 7582(KMW), 1999 WL 342353, at *4 (S.D.N.Y. May 27, 1999) (comments directed at female plaintiff about being overweight failed to support claim that the alleged hostile environment was created by sex-related conduct)). The allegation in the December 28, 2015 ODM complaint, by itself, is insufficient because it does not include any gender-based language that would support an inference that consideration of Plaintiff's gender motivated DSA Whitaker to make the statement, or support a plausible inference that gender animus motivated his actions.

While Plaintiff checked the box for "Gender" discrimination on her December 28, 2015 ODM complaint, the copy of the ODM Complaint provided by Defendant does not mention any sex-based language or conduct associated with any of the allegations therein. *See* Moore Decl., Ex. "1". Simply checking the box for gender discrimination fails to satisfy the plausibility standard under *Twombly* and *Iqbal*. *See Twombly*, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do.") (internal citations omitted); *Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.")(internal quotation marks and citations omitted). Moreover, Plaintiff's allegations that she suffered harassment by DOCCS employees Debbie Jadhon, Ms. Plaisime, and Lyubov Savitskiy, *see* Compl. ¶38, and that Plaintiff was subjected to "verbal abuse and phone calls from the facility at 10:30 p.m. and on weekends when she is off duty that feel like they are intended to harass Plaintiff," *id.* ¶39, are insufficient to provide a plausible basis to infer that the harassment was motivated by animus stemming from Plaintiff's gender.

Read in totality, the Complaint fails to provide plausible allegations that DSA Whitaker, or any other supervisor or co-worker, made any statements indicative of an intent to harass Plaintiff because of her gender, or took any action against her because of this motivation. Without this unlawful motivation, Plaintiff's gender-based hostile work environment claim is insufficient. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)("[I]t is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex.")

(interior quotation marks and citation omitted); *see also Garcia v. College of Staten Island*, 2012 U.S. Dist. LEXIS 128485, at *13-14 (E.D.N.Y. 2012) (motion to dismiss hostile work environment claim granted where no facts alleged to show defendants' conduct motivated by protected status – "[s]ince these allegations of generalized "workplace violence" have no plausible relation to plaintiff's gender, plaintiff's hostile work environment/sexual harassment claim based on these incidents should be dismissed"); *Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (plaintiff failed to state a claim for hostile work environment where she alleged that a few employees made disparaging remarks, a male used the female restroom, and she was asked for proof of hotel reservations or airline tickets to receive vacation time).

Plaintiff's conclusory assertion that she was treated "less favorably than . . . similarly situated male employees in violation of Title VII," Compl. ¶55, is insufficient to raise a plausible inference that she was subjected to a gender-based discrete adverse employment action. "To raise an inference of discriminatory motive based on a defendant's more favorable treatment of a comparator, a plaintiff 'must plead facts showing that the comparator was similarly situated in all material respects—that is, subject to the same workplace standards as Plaintiff and accused of conduct of comparable seriousness to that of which Plaintiff was accused.'" *King*, 2019 WL 3428833, at *19 (quoting *Rothbein v. City of New York*, 18-CV-5106 (VEC), 2019 WL 977878, at *10 (S.D.N.Y. Feb. 28, 2019)(interior quotation marks and citation omitted)). There are also no allegations that male employees were treated more favorably than Plaintiff in situations materially similar to those which Plaintiff contends formed the basis of her gender-based claim. Furthermore, Plaintiff does

18

not identify which adverse employment actions she refers to when she contends that she was treated less favorably than similarly situated male employees.

For the reasons discussed above, the First and Third Causes of Action are dismissed. *See, e.g., Nutt v. New York*, 2012 U.S. Dist. LEXIS 130845, at *17-18 (N.D.N.Y. 2012) (complaint dismissed where plaintiff failed to plead facts plausibly suggesting circumstances giving rise to an inference of discrimination). Because it is possible that Plaintiff could re-plead plausible gender-based claims, dismissal of these causes of action is without prejudice to amendment.

### b. Second Cause of Action - Title VII Retaliation

The Second Cause of Action asserts a claim for Title VII retaliation, contending that "Plaintiff engaged in protected activities when she filed an internal complaint of gender-based harassment and discrimination against DSA Whitaker," Compl. ¶48, and that "Defendants [*sic*] were aware that Plaintiff engaged in these protected activities regarding the hostile treatment she was receiving at the hands of DSA Whitaker." *Id.* ¶49. Defendant argues that Plaintiff's internal complaints of harassment by DSA Whitaker and other employees do not constitute protected activity within the meaning of Title VII.

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Galdieri-Ambrosini v. National Realty & Development*

*Corp.*, 136 F.3d 276, 292 (2d. Cir. 1998).[3]  An employee need not lodge a formal complaint for a complaint to qualify as a protected activity. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  "[I]nformal protests of discriminatory employment practices, including making complaints to management," are sufficient. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

"To demonstrate participation in a protected activity, a plaintiff in a retaliation case need not prove that the conditions she protested amounted to an actual Title VII violation; she need only establish that she had a good faith, reasonable belief that a violation occurred." *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009)(citing *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134 (2d Cir.1999)).  However, "the plaintiff is 'required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)(*per curiam*)(quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001).  "A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Id.*, at 15.  "[M]ere subjective good faith belief is insufficient[;] the belief must be reasonable and characterized by *objective* good faith." *Id.* at 16 (quotation omitted, emphasis in original).  "The reasonableness of the plaintiff's belief  is to be assessed in light of the totality of the circumstances." *Galdieri–Ambrosini*, 136 F.3d at

---

[3]Additionally, the protected activity must be to have been a "but for" cause of the alleged adverse action by the employer. *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2534 (2013).  "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.*" Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)(internal quotation marks and citation omitted).

292.

"As to the second element [of the *prima facie* case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Id.,* at 292. "Complaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language*." Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). However, such complaints cannot be so vague or generalized that the employer could not "reasonably have understood[ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)(citation omitted). "An employee's complaint must make clear that the employee believes he is the victim of discrimination because of a protected trait." *Johnson v. Jack Parker Corp*., No. 17-CV-3042 (AMD/SJB), 2019 WL 3428825, at *5 (E.D.N.Y. July 30, 2019)(citing *Kelly*, 716 F.3d at 17). "The onus is on the speaker to clarify to the employer that [s]he is complaining of unfair treatment due to [her] membership in a protected class and that [s]he is not complaining merely of unfair treatment generally." *Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010) (citation omitted). "Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Kelly*, 716 F.3d at 17.

Liberally construed, the Complaint alleges the following categories of potential

protected activity: (1) Plaintiff's December 28, 2015 ODM complaint; (2) Plaintiff's disciplinary grievance disputing the penalty for the disciplinary charges dated January 27, 2016; (3) Plaintiff's October 13, 2016 memorandum to DSP Joslyn complaining of verbal abuse and micromanagement by DSA Whitaker; (4) the complaint letters from Plaintiff's union attorney dated October 12, 2016 and December 1, 2016; (5) the complaint letters from Plaintiff's attorney in this action dated October 24, 2016 and December 22, 2016; and (6) the EEOC Complaint in this matter dated December 4, 2017.   The EEOC complaint is clearly Title VII protected activity of which Defendant was aware.  This satisfies the first two elements of the *prima facie* case.  The question of whether Plaintiff suffered an adverse employment action that was causally connected to the EEOC complaint is an issue that should be addressed after discovery.  Thus, Defendant's motion directed to the Second Cause of Action is denied.

Regarding the other identified potential protected activities, the allegations in the Complaint and in the documents attached to the Complaint or incorporated by reference appeared to indicate that Plaintiff did not *specifically* complain about gender, race, or national origin discrimination.  However, because the totality of the circumstances surrounding these potential protective activities might indicate that Plaintiff had a good faith belief she was complaining (or having her attorneys complain) about Title VII discrimination, and because the employer might have understood this to be the case,[4] Defendant's motion

---

[4]This is certainly plausible for the ODM complaint on which Plaintiff checked boxes for "gender" discrimination and retaliation, and for Attorney Ciotoli's October 24, 2016 letter which indicates that if the alleged harassment by DSA Whitaker does not stop he is prepared  to file suit on Plaintiff's behalf in the New York State Division of Human Rights and the Equal Employment Opportunity Commission under Title VII. Whether the other potential protected activities satisfy the first two elements of the *prima facie* case depend on what was said either in the documents and/or in connection therewith, and what the circumstances were

(continued...)

directed to these activities must be denied. Furthermore, although some of these potential protected activities occurred more than 300 days before Plaintiff filed her charge of discrimination with the EEOC on December 4, 2017, the Complaint could be read as alleging that Defendant permitted a retaliatory hostile work environment that continued into the limitations period. *See generally,* Compl.; *see also Zagaja v. Vill. of Freeport*, No. 10-CV-3660 (JFB/SIL), 2019 WL 3253062, at *3 (E.D.N.Y. July 19, 2019)("[A] retaliatory hostile work environment is established by showing incidents of harassment following complaints that were sufficiently continuous and concerted to have altered the conditions of the plaintiff's employment.")(internal quotation marks, alteration, and citation omitted); *Dapson v. City of Rochester, New York*, No. 17-CV-6704 (CJS), 2019 WL 591692, at *12 (W.D.N.Y. Feb. 12, 2019)("Courts in this Circuit recognize that an employer's creation of a retaliatory hostile work environment may constitute an 'adverse employment action' for purposes of a retaliation claim. That is, a retaliatory hostile work environment may establish one element of a retaliation claim, namely, that the plaintiff suffered an adverse employment action."); *Chin v. Port Authority of NY & NJ*, 685 F.3d 135, 156-157 (2d Cir. 2012)(Liability under Title VII for damages under a continuing violation theory may be applied to hostile work environment claims which, by their nature, involve repeated conduct[.]")(citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). Whether a retaliatory hostile work environment existed, whether it was causally connected to any of the potential protected activities, and whether it continued into the limitations period, are issues that are better addressed after discovery. For these reasons, Defendant's motion directed to the

---

[4](...continued)
surrounding the complaints.

retaliation allegedly caused by these other potential protected activities is denied.

### c. Fourth Cause of Action - Race & National Origin-Based Discrimination & Retaliation

The Fourth Cause of Action, entitled "Unlawful Retaliation and Discrimination under Title VII based on Race and National Origin," appears to allege two distinct categories of claims: (1) Title VII retaliation, and, (2) race and/or national origin-based discrimination. *See* Compl. ¶¶60-64. The claim for unlawful Title VII retaliation is redundant of the claim in the Second Cause of Action and, therefore, is dismissed as duplicative. For the reasons that follow, Plaintiff's national origin and/or race-based Title VII claims are dismissed without prejudice to amendment.

The Complaint does not allege what Plaintiff's national origin is, and her threadbare recital that she was subjected to a hostile and discriminatory work environment based on her national origin, supported by nothing more than a mere conclusory statement, is not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678, *Twombly*, 550 U.S. at 555. Furthermore, Plaintiff has not alleged facts that lead to the plausible inference that Defendant considered, or was motivated by, Plaintiff's national origin when it took or failed to take the actions Plaintiff ascribes as discriminatory.

Plaintiff does not do much better with her race-based Title VII disparate treatment and hostile work environment claims. Plaintiff does not specifically allege in the Complaint what her race is, but merely alleges that she was issued a Notice of Discipline because, during an interview she was conducting, "Plaintiff, who is of mixed race," allegedly said:

"[T]hey don't like blacks around here."  Compl. ¶ 33.[5]  While Plaintiff's allegation that she is

mixed race is sufficient to establish her race, she has not alleged facts that lead to the

plausible inference that Defendant considered, or was motivated by, Plaintiff's race when it

took the actions Plaintiff ascribes as discriminatory.  Plaintiff asserts in a list of events that

occurred to her when she returned to work on August 25, 2016 that a Dr. Smith said to her:

"Do not take this as a racial slur," but "the guy is naked in the window and looks like an

ape." Compl. Ex. "F."  This allegation is not contained in the Complaint, and even if it were,

it will be insufficient to support claims of discrete act or hostile work environment

discrimination.  Plaintiff does not identify who Dr. Smith is or whether he had any

involvement in any alleged adverse employment action to which Plaintiff was subjected.

Further, this seemingly isolated comment by Dr. Smith fails to establish that Plaintiff's work

environment was permeated by race-based derogatory comments or racially motivated

animus.

Other than Plaintiff's conclusory allegation that she was subjected to "a hostile and

discriminatory work environment . . . based on her race," Compl. ¶60, the Complaint lacks

factual allegations connecting any of Defendant's conduct or omissions to Plaintiff's race.  A

fair reading of the Complaint reveals no facts suggesting that any of the actions outlined

therein were taken because Plaintiff is "mixed-race."  Plaintiff merely recites a series of

occurrences she apparently finds objectionable along with a single assertion that she is of

unspecified "mixed-race" – without linking her race to a single allegedly harassing fact

alleged in the Complaint.  Even the complaint letters from her attorneys do not reference

_____

[5]Plaintiff denied that she made the statements.

acts or comments that would support claims of race (or gender or national origin) discrimination, but rather complain of bullying and micro-management without specifying a motivation for the conduct. The allegations in the Complaint are insufficient to state a legally plausible race-based Title VII claim. *See, e.g., Murray-Dahnir v. Loews Corp.*, 1999 U.S. Dist. LEXIS 12973, *11 (S.D.N.Y. 1999) (plaintiff failed to state a claim for race-based hostile work environment where, unlike non-African American managers, he was required to work extra hours without proper support, his supervisor ceased direct communication with him and admonished him publicly and unjustifiably on numerous occasions, and he received an illegitimate critical memo – "None of these alleged acts rise objectively to the level of racial hostility. In fact, the amended complaint fails to allege any acts or comments which are even racial in nature… they do not support his claim of a racially hostile work environment"); *Guity v. Uniondale Union Free Sch. Dist.*, 2017 U.S. Dist. LEXIS 27542 at *62 (E.D.N.Y. 2017) ("Even if the conduct complained of rose to the requisite level of severity or was otherwise pervasive, Plaintiff's claim of hostile work environment would still fail because the [Complaint] is devoid of facts (as opposed to conclusory assertions) sufficient to show that any of these actions were taken on account of Plaintiff's race or national origin as opposed to some other non-discriminatory reason"); *Hussey v. N.Y.S. Dep't. of Law*, 2013 U.S. Dist. LEXIS 39399 at *34 (E.D.N.Y. 2013) ("Other than her allegation that [plaintiff] is African American, and thus a member of a protected class, [plaintiff] has failed to plead any facts that suggest that the conduct she alleges in her . . . Complaint occurred because of her race.") (citation omitted); *Acosta v. City of New York*, 2012 US Dist. LEXIS 60460, at *21 (S.D.N.Y. 2012) ("Merely using the words 'Hispanic' in

reference to himself and 'white' in reference to the John Doe police officers in his Amended Complaint does not create a plausible inference of hostility based upon race or national origin."). Accordingly, Plaintiff's race and national origin-based Title VII claims are dismissed without prejudice to amendment.

### d. Fifth Cause of Action - Equal Protection

Defendant argues that Plaintiff's equal protection claims are barred by the Eleventh Amendment to the United States Constitution.[6] The Court agrees.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or Equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law." *KM Enters., Inc. v. McDonald*, 518 Fed. App'x 12, 13 (2d Cir. 2013)(citing U.S. Const. amend. XI and *Alden v. Maine*, 527 U.S. 706, 727–28 (1999)). "States may only be sued in federal court when they have waived their sovereign immunity, Congress has acted to abrogate state sovereign immunity pursuant to Section 5 of the Fourteenth Amendment, or the plaintiff is suing a state official in his or her official capacity for prospective injunctive relief from an ongoing constitutional violation." *Wilson v. Celestin*, No. 17-CV-5592 (MKB), 2018 WL 2304762, at *2 (E.D.N.Y. May 18, 2018)(citing U.S. Const. amend. XI; *Va. Office for Prot. & Advocacy v. Stewart*, 564 U.S. 247, 255 (2011); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013);

---

[6]Plaintiff has not responded to this argument. *See* Pl. Mem. L. , at 19 (arguing only that Plaintiff has pleaded substantively valid equal protection claims distinct from the Title VII claims).

*Woods v. Roundout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir. 2006)).

Eleventh Amendment immunity "extends beyond states themselves to state agents and state instrumentalities that are, effectively, arms of the state." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2006)(citation omitted). There can be no dispute that DOCCS is an agency and arm of the State of New York and, therefore, entitled to New York's Eleventh Amendment immunity. *See Rother v. Dep't of Corr. and Community Supervision*, 970 F. Supp. 2d 78, 89-90 (N.D.N.Y. 2013); *Armstead v. Dep't of Corr. Cmty. Supervision*, No. 13-CV-88 (ENV/JMA), 2013 WL 1312017, at *3 (E.D.N.Y. Mar. 28, 2013); *Johnson v. New York*, No. 10-CV-9532, 2012 WL 335683, at *1 (S.D.N.Y. Feb. 1, 2012).

"There is no evidence . . . that New York has waived its 11th Amendment immunity with respect to . . . DOCCS. On the contrary, [DOCCS] has successfully asserted 11th Amendment immunity to dismiss claims against it." *Armstead*, 2013 WL 1312017, at *3 (citing *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (dismissing § 1983 claim against DOCCS on 11th Amendment grounds)). Moreover, "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989). Thus, § 1983 does not operate as congressional abrogation of New York's Eleventh Amendment immunity. *See Jones v. New York State Division of Military and Naval Affairs*, 166 F.3d 45, 49 (2d Cir.1999). Further, Plaintiff has not sued a state official in his or her official capacity for prospective injunctive relief from an ongoing constitutional violation. Thus, none of the exceptions to Eleventh Amendment immunity apply.

Unlike Title VII,[7] because "[t]he State of New York has not waived its immunity with respect to Section 1983 claims… and Congress did not intend to abrogate the States' sovereign immunity with respect to such claims," this Court has no jurisdiction over Plaintiff's Fourteenth Amendment equal protection claims brought pursuant to §1983. *Sank v. City Univ. of N.Y.*, 2011 U.S. Dist. LEXIS 125016, *15-16 (S.D.N.Y. 2011); *see Howlett v. Rose*, 496 U.S. 356, 365 (1990).  Accordingly, Plaintiff's § 1983 equal protection claims are dismissed with prejudice.

## V.    CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss, Dkt. No. 8, is **GRANTED in part** and **DENIED in part.**   The motion is granted in that the First, Third, and Fourth Causes of Action are dismissed without prejudice to amendment, and the Fifth Cause of Action is dismissed with prejudice. The motion is denied as to the Second Cause of Action, which remains viable consistent with this Decision and Order.

**IT IS SO ORDERED.**

Dated:August 15, 2019

Thomas J. McAvoy
Senior, U.S. District Judge

_____

[7]The Supreme Court has held that, in enacting Title VII, Congress abrogated state sovereign immunity pursuant to its enforcement powers under Section 5 of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456-57 (1976).